# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### Case No. 3:22-cv-00246

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| v. | **JURY DEMAND** |
| **Martin A. Sumichrast,** | |
| **Defendant.** | |

## ANSWER OF DEFENDANT MARTIN A. SUMICHRAST

Defendant Martin A. Sumichrast ("Defendant") answers the Complaint ("Complaint") of Securities and Exchange Commission and alleges as follows:

## ANSWER

Defendant Martin A. Sumichrast, by and through his counsel, answers the Complaint filed by the Securities and Exchange Commission ("Commission") in this matter and asserts affirmative defenses as set forth below. Sumichrast reserves his right to request dismissal of the Complaint on any and all grounds. To the extent not explicitly admitted, all allegations in the Complaint are denied.

### RESPONSES TO SPECIFIC ALLEGATIONS

### SUMMARY

1.     Between March 2017 and March 2019, Martin A. Sumichrast engaged in a series of undisclosed and fraudulent conflict-of-interest transactions with Stone Street Partners, LLC ("Stone Street"), a private fund that he managed.

ANSWER:  The allegations in Paragraph 1 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

2.      Some of these transactions benefited Sumichrast at the expense of Stone Street and its investors.

ANSWER:  The allegations in Paragraph 2 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

3.      Most of the transactions also constituted principal transactions for which Sumichrast did not provide the requisite transaction-specific written notice or obtain the requisite consent.

ANSWER:  The allegations in Paragraph 3 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

4.      Through his conduct, Sumichrast violated, and unless restrained will continue to violate, Sections 17(a)(l) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(l), (3)]; Section l0(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.l0b-5]; and Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), (3)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

ANSWER:  The allegations in Paragraph 4 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to authority conferred upon it by Sections 20(b), (c) and (d) of the Securities Act [15 U.S.C. §§ 77t(b)-(d)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)] and Sections 209(d) and 209(e) of the

130402134.1

Advisers Act [15 U.S.C. §§ 80b-9(d)-(e)] to enjoin Defendant Sumichrast from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for disgorgement of illegally obtained funds and other equitable relief, and for civil money penalties.

ANSWER: The allegations in Paragraph 5 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

6.     This Court has jurisdiction over this action pursuant to Sections 20(b ), 20( d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], Sections 2l(d), 2l(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

ANSWER: The allegations in Paragraph 6 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

7.     Defendant Sumichrast, directly and indirectly, has made use of the mails, the means and instrumentalities of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

ANSWER: The allegations in Paragraph 7 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

8.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9], because certain of the transactions, acts, practices and courses of business constituting violations of the Securities Act, Exchange Act, and Advisers Act have occurred within the Western District of North Carolina.

ANSWER: The allegations in Paragraph 8 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

## DEFENDANT AND RELATED ENTITIES

9.      Martin A. Sumichrast ("Sumichrast"), age 55, is a resident of Charlotte, North Carolina. Between 2013 and 2020, Sumichrast served as a manager of Stone Street.   As manager of Stone Street, Sumichrast, for compensation, engaged in the business of advising Stone Street as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. He is also the Chairman of the Board of Directors and CEO of cbdMD, Inc., a publicly traded company that produces and distributes cannabis products. He previously served as cbdMD's president.

ANSWER: Sumichrast admits the allegations that he is 55, a resident of Charlotte, North Carolina and between 2013 and 2020, he was a Stone Street manager.  Sumichrast denies that (1) he engaged in the business of advising Stone Street as to the value of securities or as to the advisability of investing in, purchasing, or selling securities; and (2) he is the Chairman of the Board of Directors and CEO of cbdMD, Inc.  Sumichrast admits that (1) he was cbdMD's president and served as cbdMD's CEO until June 2022; and (2) cbdMD is a publicly traded company.  Sumichrast denies that the company distributes cannabis products but admits that cbdMD distributes hemp based cannabidiol products with a THC component under 3%.

10.     In addition, Sumichrast is a member of the board of directors and the CEO of Adara Acquisition Corp., a SPAC formed as a Delaware corporation, whose sponsors include cbdMD. Adara, which raised $100 million in a February 2021 IPO, is listed on the NYSE American stock exchange.

ANSWER: Sumichrast admits the allegations that (1) Adara Acquisition Corp. is a SPAC organized as a Delaware corporation; and (2) he was CEO and a member of the Adara board between August 2020 and May 2022. Sumichrast denies that he is a member of the board of directors or the CEO of Adara. Sumichrast has insufficient information to admit or deny whether Adara's sponsors include cbdMD but admits that while he was an Adara officer and director, Adara's sponsors included cbdMD. Sumichrast admits that Adara, raised $100 million in a February 2021 IPO, is listed on the NYSE American stock exchange.

11.     Sumichrast has been affiliated with numerous other publicly-traded companies, and in particular penny-stock companies, throughout his career.

ANSWER: Sumichrast has insufficient information to admit or deny the allegation in Paragraph 11 and on that basis denies the allegation. However, Sumichrast admits that he has provided services to other publicly-traded companies over the past twenty-nine years some of which may be deemed as "penny-stock companies."

12.     Stone Street Partners, LLC, f/k/a Siskey Capital, LLC ("Stone Street"), was a North Carolina limited liability company whose principal place of business was in Charlotte, NC. Stone Street was initially formed as Siskey Capital LLC in 2013, but changed its name to Stone Street in 2017. It was a pooled investment vehicle that invested in public and private companies.

ANSWER: Sumichrast denies the allegation that Siskey Capital LLC changed its name to Stone Street in 2017. Sumichrast admits the allegation that Siskey Capital LLC changed its name to Stone Street on December 22, 2016. Sumichrast has insufficient information to admit or deny whether Stone Street was a "pooled investment vehicle" and on that basis denies the allegation. Sumichrast admits the other allegations in Paragraph 12.

13.     Stone Street filed its Articles of Dissolution of Limited Liability Company on July 22, 2020. Sumichrast was Stone Street's co-manager from 2013 until December 2016, and its sole manager from December 2016 through its dissolution. Stone Street was never registered with the Commission in any capacity.

ANSWER:  Sumichrast admits the allegations that (1) Stone Street filed its Articles of Dissolution of Limited Liability Company on July 22, 2020; (2) he was Stone Street's co-manager between 2013 and December 2016; and (3) Stone Street was never registered with the Commission in any capacity.  Sumichrast denies the allegation that he was Stone Street's sole manager from December 2016 through its dissolution.

14.     Washington Capital I, LLC, f/k/a Washington Capital, LLC ("Washington Capital"), is a Maryland limited liability company wholly controlled by Sumichrast and owned by Sumichrast and/or his immediate family.  According to Washington Capital, the company "was used by [Sumichrast] to hold personal family assets and pay his family's personal expenses. It did not conduct any business, have employees or serve any purpose other than a pass through entity for the Sumichrast family's personal finances."

ANSWER:  Sumichrast admits the allegations that Washington Capital I, LLC, f/k/a Washington Capital, LLC ("Washington Capital") (1) was a Maryland limited liability company controlled by Sumichrast and owned by Sumichrast and/or his immediate family; (2) was used by Sumichrast to hold family business assets and pay related business expenses; and (3) did not operate any businesses, have employees or serve any other purpose.

15.     Sumichrast frequently used Washington Capital to effectuate personal transactions, including some of the transactions at issue in this litigation.

ANSWER: Sumichrast admits the allegation that Washington Capital was used to hold certain Sumichrast business assets for the Sumichrast family and that Washington Capital was involved with some transactions that alleged in the Complaint.

16.     cbdMD, Inc., f/k/a Level Brands, Inc. ("cbdMD"), is a North Carolina corporation whose principal place of business is in Charlotte, North Carolina. cbdMD is a manufacturer and seller of products containing cannabidiol. Sumichrast has been cbdMD's CEO or Co-CEO at all relevant times, has served as the Chairman of its Board of Directors since 2019, and was its president from 2016 until July 2019. cbdMD's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and is quoted on the NYSE American stock exchange under the ticker YCBD.

ANSWER: Sumichrast admits the allegations that (1) cbdMD, Inc. is a North Carolina corporation whose principal place of business is in Charlotte, North Carolina; (2) cbdMD manufactures and sells products containing cannabidiol; (3) cbdMD's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and is quoted on the NYSE American stock exchange under the ticker YCBD; (4) he was cbdMD's CEO or Co-CEO from September 2016 to June 2022; and (5) he was president from September 2016 to January 2019. Sumichrast denies that he was cbdMD's Chairman since 2019 but admits that he was Chairman from April 2015 to May 2022.

## STONE STREET BACKGROUND

17.     In 2013, Sumichrast and Richard Siskey ("Siskey"), then a prominent Charlotte, North Carolina businessman, formed Stone Street. Between 2013 and 2014, Stone Street raised $3 million through the sale of Class B Unit interests to 16 investors. In 2015, Stone Street conducted an additional offering, which raised $8.73 million from approximately 52 investors. In

connection with the second offering, all existing investors were converted to Class A members, resulting in Stone Street having only one class of equity.

ANSWER:  Sumichrast has insufficient information to admit or deny the allegations that in 2013, Siskey was a prominent Charlotte, North Carolina businessman and on that basis, denies the allegation.  Sumichrast admits the allegations that (1) he and Siskey organized Stone Street which, between 2013 and 2014, raised $3 million through the sale of Class B Unit interests to 16 investors; and (2) in 2015, Stone Street conducted an additional offering, which raised $8.73 million from approximately 52 investors in connection with the this offering, existing investors were converted to Class A members, resulting in Stone Street having only one class of equity.

18.     Siskey and Sumichrast were designated in Stone Street's private placement memorandum ("PPM") and operating agreement (the "Operating Agreement") as the fund's co-managers. Stone Street did not have a board, trustee, investment committee, or any other independent governing committee.

ANSWER:  Sumichrast admits the allegations that (1) Stone Street's private placement memorandum ("PPM") and operating agreement (the "Operating Agreement") identified Siskey and Sumichrast as Stone Street's managers; and (2) Stone Street did not have a board, trustee, investment committee, or any other independent governing committee as none was required. Sumichrast denies the allegation that Stone Street was a "fund."

19.     As a result, Siskey and Sumichrast had broad discretion with respect to Stone Street's operations and investment portfolio, including responsibility for all of Stone Street's investment decisions; however, the Operating Agreement imposed upon Siskey and Sumichrast various duties, and required all related party transactions entered into by Stone Street to be approved by a majority of Stone Street's Class A members via either vote or written consent.

ANSWER: Sumichrast admits the allegations that (1) he and Siskey had broad discretion as to Stone Street's operations and investment portfolio, including broad discretion in identifying businesses with "experienced management teams" that in exchange for an equity interest, Stone Street would "advise and assist in growing their businesses" to "create "significant value for all shareholders of such business, including [Stone Street] as a significant shareholder"; and (2) the Operating Agreement states that related party transactions entered into by Stone Street required the approved by a majority of Stone Street's Class A members via either vote or written consent.

20.     Specifically, Section 5.5 of the Operating Agreement provided:

**Related Party Transactions**. Any contract or other transaction between or among the LLC and a Member, Manager or Officer, any Affiliate of a Member, Manager or Officer or any other Person in, of or with which the Member, Manager or Officer is a partner, creditor, stockholder, owner, member, manager, trustee, employee, director or officer, or otherwise has a substantial financial, economic, or contractual interest or relationship, shall require the Approval of the Members.

ANSWER: Sumichrast admits the allegation that Section 5.5 of the Operating Agreement includes the above cited language.

21.     "Approval of the Members" was defined as "approval by vote or written consent of the holders of the majority of the issued and outstanding Class A Units." Likewise, the PPM stated that "Richard Siskey or Martin Sumichrast may transact business with the Company with the approval of holders holding a majority of the Units."

ANSWER: Sumichrast admits the allegation that the Operating Agreement and PPM includes the above cited language.

22.     In addition to the disclosure obligations explicitly imposed by the Operating Agreement, Siskey and Sumichrast owed fiduciary duties to Stone Street as its investment advisers and managers.

ANSWER: The allegations in Paragraph 22 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast has insufficient information to admit or deny (1) whether the Operating Agreement "explicitly imposed" disclosure obligations on Sumichrast; and (2) the allegation relating to Siskey and on that basis denies the allegations. Sumichrast denies the allegation that he was an "investment advisor" who, as such, owed fiduciary obligations to Stone Street.

23. In December 2016, Siskey died by suicide not long after an investigation began into his role with an unrelated Ponzi scheme that he operated from September 2010 through December 2016. After Siskey's death, Sumichrast became Stone Street's sole manager.

ANSWER: Sumichrast has insufficient information to admit or deny whether (1) Siskey died by suicide and whether his death occurred not long after an investigation began into his role in a Ponzi scheme; and (2) Siskey's Ponzi schemes were limited to the period between September 2010 and December 2016 and on that basis denies the allegations. Sumichrast admits that Siskey's Ponzi scheme was unrelated to Stone Street and Sumichrast. Sumichrast denies the allegation that upon Siskey's death in December 2019, Sumichrast became Stone Street's sole manager.

## SUMICHRAST'S SELF- DEALING

24. After Siskey's death, Sumichrast engaged in multiple transactions that advanced his interests, often at the expense of the interests of Stone Street and its investors. Each of the transactions qualified as related party transactions under the Operating Agreement and PPM.

ANSWER: The allegations in Paragraph 24 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegation that after Siskey's death, Sumichrast engaged in multiple transactions that advanced his interests,

often at the expense of the interests of Stone Street and its investors. Sumichrast has insufficient information to admit or deny whether any of the unspecified transactions referenced in Paragraph 24 qualify as related party transactions under the Operating Agreement and PPM and on that basis denies the allegation.

25. Sumichrast did not disclose in advance to Stone Street or its investors-let alone seek their consent-any information concerning these transactions or the multiple ways in which Sumichrast's interests conflicted with those of Stone Street and its investors.

ANSWER: Sumichrast denies the allegations in Paragraph 25 of the Complaint.

A. **Sumichrast Doubles His Salary**

26. Pursuant to Stone Street's PPM, Sumichrast and Siskey would "each receive a salary of $100,000 per year from" Stone Street. Subsequently, in March 2017, after Siskey's death, Sumichrast paid himself an additional $100,000 out of Stone Street's account. Sumichrast then paid himself $200,000 per year in 2018 and 2019.

ANSWER: Sumichrast admits that (1) Stone Street's February 9, 2015 PPM states that Sumichrast and Siskey would "each receive a salary of $100,000 per year from" Stone Street; (2) in January 2017, Stone Street paid Sumichrast $100,000 in salary for 2017; and (3) after Sumichrast became the sole manager of Stone Street, Stone Street paid Sumichrast the entire salary due to Stone Street managers in 2017, 2018 and 2019, but relinquished his right to any portion of his management salary in 2020.

27. All of these payments were made by Stone Street to Washington Capital. To fund the 2018 payment, Sumichrast caused Stone Street to sell approximately $200,000 worth of securities. Absent this sale of securities, Stone Street would not have had sufficient cash to pay Sumichrast the extra $100,000.

ANSWER: Sumichrast admits the allegation that his Stone Street salary was paid to Washington Capital. Sumichrast denies the allegations that (1) he received "extra" compensation; (2) to fund his 2018 salary, he caused Stone Street to sell approximately $200,000 worth of securities; and (3) absent Stone Street's sale of securities, the company would not have had sufficient cash to pay Sumichrast $100,000.

28.     Sumichrast never disclosed to Stone Street or its investors that he paid the extra $100,000 salary to himself and never obtained Stone Street's consent.

ANSWER: Sumichrast denies the allegations that he never disclosed to Stone Street or its investors that he paid the extra $100,000 salary to himself, never obtained Stone Street's consent or that disclosure or consent were required.

### B.     Sumichrast Uses Stone Street Funds to Strengthen cbdMD's Balance Sheet

29.     Stone Street became a cbdMD investor in 2015, and held approximately five million cbdMD shares at the time of Siskey's death in December 2016.

ANSWER: Sumichrast admits the allegation that in 2015, cbdMD became a Stone Street portfolio company. Sumichrast denies the allegation that at the time of Siskey's December 2016 death, Stone Street held approximately 5 million cbdMD shares.

30.     In October 2017, cbdMD completed a Regulation A+ offering and its shares have traded on the NYSE American exchange since that time.

ANSWER: Sumichrast admits the allegations in Paragraph 30.

31.     Prior to this public offering of stock, cbdMD's underwriter told Sumichrast that cbdMD's shares would be more attractive if it were to eliminate some debt.

ANSWER: Sumichrast admits that prior to the public offering of cbdMD stock, cbdMD's underwriter conditioned the underwriting on cbdMD's elimination of the debt on the

balance sheet. Sumichrast admits that after negotiations with, and the agreement by, cbdMD's underwriter, cbdMD converted its debt to equity at $3.95 per share.

32. Accordingly, in advance of this offering, Sumichrast, caused Stone Street to engage in a series of transactions with cbdMD that were designed to improve cbdMD's balance sheet and thus improve the prospects of cbdMD's eventual stock offering. Many of these transactions benefited cbdMD to the detriment of Stone Street.

ANSWER: Sumichrast admits the allegation that in advance of cbdMD's public offering, in his capacity as cbdMD's Chairman and CEO, Sumichrast negotiated a series of transactions with cbdMD investors, including Stone Street investors, to convert their debt into equity as required by the underwriter. Sumichrast denies the allegation that this or any other transaction benefited cbdMD to the detriment of Stone Street or its members.

33. Sumichrast received a personal benefit for taking cbdMD public. As a part of his January 2017 employment agreement with cbdMD, Sumichrast was entitled to a discretionary bonus at the sole discretion of cbdMD's Board. In January 2018, cbdMD rewarded Sumichrast by giving him a discretionary bonus of $240,000 "based on the prior year accomplishment."

ANSWER: Sumichrast admits the allegations that (1) his employment agreement with cbdMD entitled him to a discretionary bonus; and (2) in January 2018, Sumichrast received a $240,000 bonus "based on the prior year accomplishment." Sumichrast denies the allegations that (1) the bonus was solely for taking cbdMD public; and (2) his 2018 bonus was granted at the sole discretion of the cbdMD's Board. Sumichrast admits that the bonus was determined in the sole discretion of the Board's Independent Compensation Committee as required by NYSE rules.

### i.     Sumichrast Causes Stone Street to Purchase cbdMD Shares

34.     Sumichrast caused Stone Street on July 18, 2017 to purchase 56,500 shares of cbdMD stock for $223,175, or $3.95 per share, from cbdMD.  cbdMD used the proceeds from this sale, and the sale of shares to other investors, to pay down cbdMD's line of credit.

ANSWER:  Sumichrast admits the allegations in Paragraph 34.

35.     Although Sumichrast's affiliation with cbdMD made this a related party transaction, Sumichrast failed to disclose the transaction, or his conflict of interest (including his financial interest in receiving a possible discretionary bonus from cbdMD), in advance to Stone Street or its investors, or obtain their consent to Stone Street's purchase of additional cbdMD shares.

ANSWER:  The allegations in Paragraph 35 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegation that he failed to make any required disclosure to Stone Street or its investors or obtain any consent required for the purchase of cbdMD shares.

### ii.    Sumichrast Further Strengthens cbdMD by Causing Stone Street to Purchase Worthless NuGene International, Inc. Preferred Stock

36.     Also in July 2017, in a further effort to strengthen cbdMD's cash position prior to its public offering, Sumichrast caused Stone Street to purchase near-worthless securities from I'Ml, LLC ("I'Ml "), a majority owned subsidiary of cbdMD that was controlled by cbdMD and included in cbdMD's consolidated financial statements.

ANSWER:  Sumichrast admits the allegations that (1) in July 2017, he caused Stone Street to purchase 65 shares of Series B Convertible Preferred Stock of NuGene International Inc. (the "NuGene Preferred Shares") from I'M1, LLC; and (2) I'M1 was a majority owned subsidiary of cbdMD which was included in cbdMD's consolidated financial statements.

Sumichrast denies the allegations that (1) the purchase of the NuGene Preferred Shares was to strengthen cbdMD's cash position prior to its public offering; and (2) the securities purchased from I'M1 were "near-worthless."

37.     I'Ml previously had entered into a consulting agreement with NuGene International, Inc. ("NuGene"), an unaffiliated cosmetics company, pursuant to which cbdMD received 2.5 million shares of Nu Gene common stock, valued at approximately $650,000.

ANSWER:  Sumichrast admits the allegations in Paragraph 37.

38.     At the time of I'Ml's agreement with NuGene, NuGene was a publicly traded company whose common stock traded on the pink sheets. NuGene, however, was heavily in debt and at risk of failing.

ANSWER:  Sumichrast has insufficient information to admit or deny whether at the time of I'M1's agreement with NuGene, NuGene was traded on the pink sheets and/or whether NuGene was heavily in debt and at risk of failing and on that basis denies the allegations.

39.     In fact, NuGene's 2016 Form 10-K filed with SEC's EDGAR system on April 12, 2017, included a management disclosure that there was substantial doubt about the company's ability to continue as a going concern, and the audit opinion letter accompanying NuGene's financial statements also included a going concern qualification.

ANSWER:  Sumichrast has insufficient information to admit or deny the allegations in Paragraph 39 and on that basis denies the allegations.

40.     Subsequently, in May 2017, NuGene filed a notice with the Commission stating that it was unable to file its quarterly report on Form 10-Q within the prescribed time period.

ANSWER:  Sumichrast has insufficient information to admit or deny the allegations in Paragraph 40 and on that basis denies the allegations.

41.     On July 27, 2017, I'Ml and NuGene executed an amendment to their consulting agreement, effective June 30, 2017. In the amendment, I'Ml specifically noted that NuGene failed to make its required filings with the Commission and, as a result, its "stock is no longer quoted on the OTCB and the market value has materially declined."

ANSWER:  Sumichrast has insufficient information to admit or deny the allegations in Paragraph 41 and on that basis denies the allegations.

42.     Pursuant to the amended consulting agreement, on June 30, 2017, cbdMD exchanged its 2.5 million shares of NuGene common stock for 65 shares of NuGene's Series B Convertible Preferred Stock, with a stated value of $10,000 per share.

ANSWER:  Sumichrast has insufficient information to admit or deny the allegations in Paragraph 42 and on that basis denies the allegations.

43.     The 65 preferred shares were each convertible to common shares using the lesser of either $0.26 or the 30-day trading average, that would provide a number of shares equal to the value of $10,000 per preferred share-i.e., at the $.26 conversion rate, cbdMD would have received 2.5 million NuGene common shares upon converting all 65 preferred shares.

ANSWER:  Sumichrast admits the allegation that the 65 NuGene Preferred Shares were each convertible to common shares using the lesser of either $0.26 per common share or the 30-day trading average.  Sumichrast admits that at a conversion rate of $0.26, the NuGene Preferred Shares would convert to 2.5 million NuGene common shares or, for instance, at a $0.039 conversion rate, the 65 NuGene Preferred Shares would convert to 16,666,667 shares of NuGene common stock, a floorless convertible feature negotiated by Sumichrast and designed to protect the holder of the NuGene Preferred Shares against losses caused by a decline in share price of the common stock.

44.     On July 31, 2017, Sumichrast caused Stone Street to purchase the NuGene convertible shares from I'Ml for $475,000: $200,000 in cash and a promissory note for the $275,000 balance, which was fully paid by the end of 2018. The purchase price was set unilaterally by cbdMD and no third-party valuation was performed to determine the value of the NGene convertible shares.

ANSWER:  Sumichrast admits the allegations that on July 31, 2017, he caused Stone Street to purchase the 65 NuGene Preferred Shares from I'Ml for $475,000: $200,000 in cash and a promissory note for the $275,000 balance.  Sumichrast has insufficient information to admit or deny the allegation that no third-party valuation was performed to determine the value of the NuGene Preferred Shares and on that basis denies the allegation.  Sumichrast denies the allegation that the purchase price was set unilaterally by cbdMD or that a third-party valuation was required.

45.     By infusing additional cash into I'Ml, Sumichrast further strengthened cbdMD's financial position in advance of its public offering because I'Ml 's financials were included in cbdMD's consolidated financial statements.

ANSWER:  Sumichrast denies that infusing cash into I'M1 strengthened cbdMD's financial position in advance of its public offering.  Sumichrast admits the allegation that I'Ml 's financials were included in cbdMD's consolidated financial statements.

46.     Not only did Sumichrast fail to disclose this related party transaction to Stone Street and its investors, or seek their consent, the transaction harmed Stone Street and benefited only cbdMD (and ultimately, Sumichrast).

ANSWER:  Sumichrast denies the allegations in Paragraph 46.

47.     Stone Street received 65 non-marketable convertible preferred shares of a failing company that was not current on its SEC filings and would eventually deregister. The shares were convertible into millions of shares of thinly traded common stock, but such a conversion would have greatly diluted the market price for the common shares, which closed at $0.039 per share on June 29, 2017.   Thus, Stone Street would not have been able to unload its shares without causing a substantial additional decrease in value.

ANSWER:  Sumichrast denies the allegations that (1) the 65 NuGene Preferred Shares were "non-marketable"; (2) NuGene was "thinly traded"(in fact, NuGene common traded in excess of 25.6 million shares during the period in which Stone Street held its 65 preferred shares; (3) conversion of the NuGene Preferred Shares into common would have greatly diluted the market price for the common shares, which closed at $0.039 per share on June 29, 2017; and (4) Stone Street would not have been able to unload its shares without causing a substantial additional decrease in value.   Sumichrast has insufficient information to admit or deny the allegations that NuGene was a failing company that was not current on its SEC filings and would eventually deregister and on that basis denies the allegation.

48.     Tellingly, Stone Street's audited financials for 2017 and 2018 listed the NuGene shares as having a fair value of $0.  In other words, at Sumichrast's direction, Stone Street paid $475,000, and received essentially nothing of value in return.

ANSWER:  Sumichrast admits the allegation that based on consultation with Stone Street's auditors and in accordance with its accounting policies, the NuGene Preferred Shares were categorized as Level 3 securities and under GAAP were conservatively valued at $0 and. Sumichrast denies the allegations that Stone Street paid $475,000 and received essentially

nothing of value in return (Stone Street sold the 65 NuGene Preferred Shares in May 2019 for $313,500).

**C.     Stone Street's Transactions With Washington Capital, LLC**

> **i.     Sumichrast Causes Stone Street to Loan Money to Washington Capital**

49.     On July 1, 2017, Sumichrast caused Stone Street to loan $70,000 to Washington Capital, a company that was owned by Sumichrast's family and controlled by Sumichrast. After this loan, Washington Capital's total indebtedness to Stone Street exceeded $300,000.

ANSWER:  Sumichrast admits the allegation that on or about July 1, 2017, Sumichrast caused Stone Street to loan an additional $70,000 to Washington Capital as the second tranche of a $500,000 loan approved in 2016, prior to Siskey's death.  Sumichrast denies the allegation that after the July 1, 2017 loan, Sumichrast's net indebtedness to Stone Street, through Washington Capital, exceeded $300,000.

50.     Even though it was a related party transaction, Sumichrast neither obtained the requisite consent from a majority of Stone Street's shareholders prior to this $70,000 loan nor disclosed his conflict of interest.

ANSWER:  Sumichrast denies the allegations in Paragraph 50.

51.     On January 1, 2018, Washington Capital's outstanding principal and interest owed to Stone Street totaled $325,777.

ANSWER:  Sumichrast admits the allegation that as of January 1, 2018, Washington Capital owed principal and interest to Stone Street in the amount of approximately $325.777.

52.     As of that same date, Sumichrast caused Stone Street and Washington Capital to enter into an agreement pursuant to which Washington Capital repaid the entire balance of the loan by transferring to Stone Street 651,553 shares of Kure Corp. ("Kure"), a private vaping

company of which Sumichrast, through Washington Capital, was the fifth largest shareholder and former member of the board of directors.

ANSWER: Sumichrast admits the allegations that as of that same date, Sumichrast caused Stone Street and Washington Capital to enter into an agreement pursuant to which Washington Capital repaid the entire balance of the loan by transferring to Stone Street 651,553 shares of Kure Corp. ("Kure"), a private vaping company. Sumichrast has insufficient information to admit or deny the allegation that he was Kure's fifth largest shareholder and on that basis denies the allegation.

53. Sumichrast also had an ongoing financial relationship with Kure, in that he was assisting that company with its efforts to be acquired.

ANSWER: Sumichrast admits the allegations that (1) he and Stone Street had an ongoing financial relationship with Kure; and (2) Stone Street was assisting Kure, a Stone Street portfolio company, in its successful efforts to be acquired by Isodiol at $1.00 per share (or $50 million) thereby enhancing the value of Kure for its shareholders, including Stone Street.

54. The valuation of Kure stock for the loan repayment was not based on a third-party valuation or any attempt to accurately value the shares.

ANSWER: Sumichrast denies the allegations in Paragraph 54.

55. Sumichrast did not obtain the requisite consent from a majority of Stone Street's shareholders prior to this related party transaction or disclose his conflict of interest.

ANSWER: Sumichrast denies the allegation that he did not obtain the requisite consent of a majority of Stone Street's shareholders prior to the transaction or that he failed to disclose any conflict of interest.

      **ii.**    **Sumichrast Causes Stone Street to Purchase Restricted cbdMD Stock From Washington Capital**

56.    On July 1, 2018, Sumichrast caused Stone Street to purchase from Washington Capital 150,000 restricted shares of cbdMD stock in a private placement for $645,000, or $4.30 per share.

ANSWER:  Sumichrast admits the allegations in Paragraph 56.

57.    Stone Street paid Washington Capital $45,000 cash, with the $600,000 balance secured by a security agreement and to be paid pursuant to a promissory note with a 5% per annum interest rate.

ANSWER:  Sumichrast admits the allegation in Paragraph 57.

58.    Sumichrast failed to disclose this transaction in writing in advance to Stone Street or its investors or obtain their consent.

ANSWER:  Sumichrast admits the allegation that he did not disclose this transaction in writing in advance to Stone Street investors.  Sumichrast denies that he did not disclose the transaction in advance to Stone Street or obtain the consent of Stone Street investors.

59.    The $4.30 per share transaction price was not based on an independent valuation and was unjustifiably high under the circumstances.

ANSWER:  Sumichrast denies the allegations in Paragraph 59.

60.    For example, the price reflected a 16% premium over the previous day's $3.70 closing price for freely traded common shares of cbdMD. But here, Stone Street acquired a non-controlling block of restricted shares, meaning that an illiquidity discount should have been applied to the common share price to arrive at an appropriate, lower price for the restricted shares.

130402134.1

ANSWER:  The allegations in Paragraph 60 state legal conclusions to which Sumichrast need not respond.   To the extent a response is required, Sumichrast admits that the shares closed at $3.70 the day prior to the transaction.  Sumichrast denies the other allegations in Paragraph 60.

**D.  Sumichrast Causes Stone Street to Loan Money to Kure**

61.     In April 2018, Sumichrast caused Stone Street to loan Kure $80,000. The loan ws repaid later that month

ANSWER:  Sumichrast admits the allegations in Paragraph 61.

62.     At the time of this loan, Sumichrast was a Kure shareholder, was representing Kure in an attempted merger with Isodiol International Inc. (from whom he received warrants), and had just received $100,000 of compensation for his work for Kure.

ANSWER:  Sumichrast admits the allegations that at the time of the $80,000 Kure loan, (1) he was a Kure shareholder; (2) he was representing Kure in a contemplated merger with Isodiol International Inc.; and (3) the loan was fully repaid within 30 days.   Sumichrast denies the allegations that (1) he received warrants from Isodiol; and (2) he "had just received $100,000 of compensation for his work for Kure".

63.     Subsequently, in March 2019, Stone Street provided a $50,000 bridge loan to Kure. In October 2019, the loan was converted into Kure stock at $0.10 per share.

ANSWER:  Sumichrast admits the allegation that in March 2019, Stone Street provided a $50,000 bridge loan to Kure.  Sumichrast has insufficient information to admit or deny that in October 2019, the loan was converted into Kure stock at $0.10 per share, as the loan was sold in August 2019 to a third party who owned shares in both Kure and Stone Street.

64.     Sumichrast did not obtain the requisite consent from a majority of Stone Street's shareholders prior to this related party transaction, or disclose his conflict of interest.

ANSWER: Sumichrast denies the allegations that he failed to obtain requisite consent and that he failed to disclose a conflict of interest.

## COUNT I-FRAUD
### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(l)]

65.     Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

ANSWER: The allegations in Paragraph 65 state legal conclusions to which Sumichrast need not respond.

66.     Between March 2017 and March 2019, Sumichrast, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

ANSWER: The allegations in Paragraph 66 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

67.     Defendant Sumichrast knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

ANSWER: The allegations in Paragraph 67 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

68.     In engaging in such conduct, the Defendant acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

ANSWER: The allegations in Paragraph 68 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

69.     By reason of the foregoing, Defendant Sumichrast directly and indirectly violated and, unless enjoined, will continue to violate Section l7(a)(l) of the Securities Act [15 U.S.C. § 77q(a)(l)].

ANSWER:  The allegations in Paragraph 69 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

**COUNT II-FRAUD**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

70.     Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

ANSWER:  The allegations in Paragraph 70 state legal conclusions to which Sumichrast need not respond.

71.     Between March 2017 and March 2019, Sumichrast, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a)      obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b)      engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

ANSWER:  The allegations in Paragraph 71 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

72.     By reason of the foregoing, Sumichrast directly and indirectly violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)].

ANSWER:  The allegations in Paragraph 72 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

**COUNT III-FRAUD**
**Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)]**
**and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5]**

73.     Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

ANSWER:  The allegations in Paragraph 73 state legal conclusions to which Sumichrast need not respond.

74.     Between March 2017 and March 2019, Sumichrast, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a)     employed devices, schemes, and artifices to defraud; and

b)     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

ANSWER:  The allegations in Paragraph 74 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

75.     Sumichrast knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Defendants acted with

scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

ANSWER: The allegations in Paragraph 75 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

76. By reason of the foregoing, Sumichrast violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

ANSWER: The allegations in Paragraph 76 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

### COUNT IV-FRAUD BY AN INVESTMENT ADVISER
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. §§ 80b-6(1), (2)]

77. Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

ANSWER: The allegations in Paragraph 77 state legal conclusions to which Sumichrast need not respond.

78. Defendant Sumichrast was at all relevant times an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

ANSWER: The allegations in Paragraph 78 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

79. Defendant Sumichrast, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce: (a) acting knowingly or recklessly, employed devices, schemes, or artifices to defraud; or (b) engaged in transactions, practices, or courses of business which operated as fraud or deceit upon a client or prospective client.

130402134.1

ANSWER:  The allegations in Paragraph 79 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

80.     By reason of the foregoing, Sumichrast violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

ANSWER:  The allegations in Paragraph 80 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

## COUNT V-FRAUD BY AN INVESTMENT ADVISER
### Violations of Section 206(3) the Advisers Act
### [15 U.S.C. § 80b-6(3)]

81.     Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

ANSWER:  The allegations in Paragraph 81 state legal conclusions to which Sumichrast need not respond.

82.     Defendant Sumichrast was at all relevant times an investment adviser within the meaning of Section 202(a)(l1) of the Advisers Act [15 U.S.C. § 80b-2(a)( 1)].

ANSWER:  The allegations in Paragraph 82 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

83.     Defendant Sumichrast, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, while acting as principal for his own account, knowingly sold securities to, and/or purchased securities from, a client without disclosing to such client in writing before the completion of such transaction the capacity in which he was acting and obtaining the consent of the client to such transaction.

ANSWER:  The allegations in Paragraph 83 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

84.     By reason of the foregoing, Sumichrast violated and, unless enjoined, will continue to violate Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)]

ANSWER:  The allegations in Paragraph 84 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

## COUNT VI-FRAUD BY AN INVESTMENT ADVISER
### Violations of Section 206(4) the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 Thereunder [17 C.F.R. § 275.206(4)-8]

85.     Paragraphs 1 through 64 are hereby realleged and are incorporated herein by reference.

ANSWER:  The allegations in Paragraph 85 state legal conclusions to which Sumichrast need not respond.

86.     Defendant Sumichrast was at all relevant times an investment adviser to a pooled investment vehicle within the meaning of Rule 206(4)-8 of the Advisers Act.

ANSWER:  The allegations in Paragraph 86 state legal conclusions to which Sumichrast need not respond.  To the extent a response is required, Sumichrast denies the allegations.

87.     Defendant Sumichrast directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce:

a)      Made untrue statements of fact and/or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; and

b)      Otherwise engaged in acts, practices, and courses of business that were fraudulent, deceptive, or manipulative with respect to investors and prospective investors in a pooled investment vehicle.

ANSWER: The allegations in Paragraph 87 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

88. By reason of the foregoing, Sumichrast violated and, unless enjoined, will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

ANSWER: The allegations in Paragraph 88 state legal conclusions to which Sumichrast need not respond. To the extent a response is required, Sumichrast denies the allegations.

**PLAINTIFF'S PRAYER FOR RELIEF**

Martin Sumichrast denies all allegations in Plaintiff's prayer for relief and denies that Plaintiff is entitled to any relief, as prayed for in its Complaint or otherwise.

**AFFIRMATIVE DEFENSES**

Without assuming the burden of proof for such defenses that he would not otherwise have, Sumichrast pleads the following Affirmative Defenses, reserving the right to plead such additional separate defenses as may appear in the future.

**First Affirmative Defense**

The Complaint fails to allege any claim upon which relief can be granted.

**Second Affirmative Defense**

The Commission's claims are barred, in whole or in party, by applicable statutes of limitations or laches.

**Third Affirmative Defense**

The Commission's claims are barred, in whole or in part, because Sumichrast relied in good faith upon the judgment, advice and counsel of professionals and interpretation of the statutes, regulations and interpretations as they existed at the time.

### Fourth Affirmative Defense

The Commission's claims are barred, in whole or in part, by the doctrines of estoppel and waiver.

### Fifth Affirmative Defense

The Commission's claims are barred in whole or in part, for lack of standing or jurisdiction to bring claims against Sumichrast under the Investment Advisors Act of 1940.

### Sixth Affirmative Defense

The Commission's claims are barred, in whole or in part, by the Commission's unclean hands and lack of good faith.

### Seventh Affirmative Defense

The Commission's claims for penalties are barred because any alleged violations were isolated and/or unintentional.

### Eighth Affirmative Defense

The Commission's claim for disgorgement is barred because Sumichrast never received ill-gotten gains and because the Commission lacks authority to seek or obtain disgorgement.

### Ninth Affirmative Defense

The Commission's claims are barred in whole or in part, because Sumichrast did not act with the requisite scienter.

### Tenth Affirmative Defense

The Commission's claims are barred in whole or in part because Sumichrast relied on exemptions from the registration under the Investment Advisors Act of 1940 and other provisions thereof.

### Eleventh Affirmative Defense

The Commission's claim for injunctive relief is barred because there has been no violation of the Securities Act, the Exchange Act or the Investment Advisors Act of 1940.

### Twelfth Affirmative Defense

Sumichrast presently lacks sufficient knowledge and information on which to form a belief as to whether he has additional affirmative defenses and therefore gives notice that he reserves his right to assert further affirmative and/or additional defenses in the event that discovery reveals them appropriate.

WHEREFORE, Sumichrast respectfully requests that this Court enter an order:

1.      Dismissing each of the Commissions' claims with prejudice;

2.      Awarding Sumichrast costs of suit including attorney's fees; and

3.      Awarding Sumichrast such further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Sumichrast requests a trial by jury for all issues so triable.

Dated: August 1, 2022                             Respectfully submitted,


                                                  /s/*Mark A. Jones*
                                                  Mark A. Jones N.C. State Bar No. 36215
                                                  Edward B. Davis, N.C. State Bar No. 27546
                                                  BELL, DAVIS & PITT, P.A.
                                                  227 West Trade Street, Suite 1800
                                                  Charlotte, NC  28202
                                                  Tel: (704) 227-0400
                                                  Fax: (704) 227-0178
                                                  Email: mjones@belldavispitt.com
                                                          ward.davis@belldavispitt.com

                                                  Ellyn S. Garofalo, CA State Bar No. 158795
                                                  (pro hac vice motion forthcoming – not yet
                                                  admitted)
                                                  CARLTON FIELDS, LLP
                                                  2029 Century Park East

Suite 1200
Los Angeles, CA  90067
Tel: (310) 843-6340
Email: EGarofalo@carltonfields.com

*Counsel for Defendant Martin A. Sumichrast*

130402134.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record in the system.

This the 1st day of August 2022.

/s/ Edward B. Davis
Edward B. Davis